Filed 1/29/16  In re N.A. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re N.A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064101 |
| Plaintiff and Respondent, | (Super.Ct.No. J249334) |
| v. | OPINION |
| S.P. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant S.P.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant P.A.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

Defendants and appellants P.A. (father) and S.P. (mother) are parents of N.A. (minor; born September 2010), the subject of this dependency.

On appeal, mother and father (collectively, "parents") challenge the termination of their parental rights by the juvenile court under Welfare and Institutions Code section 366.26.[1]  For the reasons set forth below, we shall affirm the trial court's judgment terminating both mother's and father's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

A.    FAMILY BACKGROUND

Parents' criminal histories span from 2003 to 2012; they include drug and willful child cruelty charges.  Parents' child welfare histories span from 2005 to 2015.  In February of 2005, a dependency proceeding was initiated on behalf of S.A., minor's older sibling.  Parents attended substance abuse treatment, reunified with S.A., and the court dismissed the case on June 21, 2006.

In February of 2009, CFS initiated a dependency proceeding for minor's siblings, S.A. (born 2005), El.A. (born 2006), and J.A. (born 2008).  The family home was infested with roaches, and had piles of trash, safety hazards and a foul smell.  The children lacked clean clothing.  Mother had mental health issues.  Parents were incarcerated for child endangerment.  One month later, in March of 2009, mother gave

_____

[1]  All statutory references are to the Welfare and Institutions Code unless otherwise specified.

birth to another sibling, No.A., via emergency caesarian section because of mother's substance abuse. No.A. tested positive for methamphetamine and marijuana. CFS initiated a dependency on No.A., and joined it with his siblings' cases. In April 2009, the juvenile court sustained the petitions, ordered family reunification (FR) services, and maintained the siblings in foster care.

Parents minimally progressed in their case plans. The court therefore terminated FR services and set a section 366.26 hearing. On February 19, 2010, the court terminated the parental rights of both mother and father for all four siblings.

Minor was born September 2010, and CFS commenced dependency proceedings on her behalf. The juvenile court applied FR bypass and set a section 366.26 hearing. Parents, however, obtained services via section 388 petitions. Minor was placed with B.J. and S.J. (the Js), and her older siblings for approximately one year. On February 2, 2011, the court finalized the adoption of minor's siblings by the Js. On November 3, 2011, parents reunified with minor, who was barely one year old.

B.    DETENTION AND JURISDICITION/DISPOSITION HEARINGS, AND SETTING OF SECTION 366.26 HEARING

In May 2013, minor was two years old when CFS again responded to allegations of neglect by parents. A deputy responded to a report that a two-year-old child was burned by a cigarette at parents' address. The windows were all closed, and the air conditioning unit was off. Parents were drinking beer, apparently intoxicated and unconcerned that the deputy entered their home. The home smelled of rotten trash, urine and cigarette smoke, and was littered with old food, dirty diapers, broken glass, piles of

3

clothing, beer cans and beer bottles.  The house also had black mold, and live and dead cockroaches.  Minor was filthy and smelled of urine.  Parents were arrested for willful cruelty.  CFS initiated a dependency.  The section 300 allegations addressed the filthy home, parents' failure to provide basic needs, and parents' substance abuse.

When interviewed, father smelled badly and mother had urinated on herself.  The bathroom smelled of urine and feces.  Mother was pregnant.  Minor was barefoot; there were shards of glass everywhere.  Father received disability benefits and mother had no job.  CFS placed minor with the Js, who were considered minor's extended family.

As of May 30, 2013, parents reported that they were released from jail.  They were required to attend work release and comply with probation.  During minor's first visit with parents, minor screamed for about 10 minutes.  She was writhing while screaming, and she became inflicted with diarrhea.

In the jurisdiction/disposition (J/D) report dated May 30, 2013, CFS recommended the court sustain the petition and apply FR services bypass.  Parents had four of their six children adopted.  Mother had an older child who was placed with his father.  She was now six months pregnant, with her seventh child, and was drinking alcohol while she was pregnant.  Parents continually abused substances, resided in filthy living conditions, and demonstrated a pattern of abuse and neglect they were not likely to overcome through services.

In June 2013, the Js took minor to a pediatric clinic.  A nurse practitioner diagnosed minor with PTSD and anxiety stemming from minor's "biological dysfunctional family unit."  The nurse practitioner recommended suspension of parental

4

visits due to detriment to minor, and recommended therapy. CFS asked the court to suspend parental visits.

On July 19, 2013, parents testified at the J/D hearing. They denied abusing substances. Mother indicated their home was dirty because she was lazy that day. She admitted that her visit with minor lasted 10 minutes, and for the first five minutes, minor did not interact at all.

The court sustained the section 300 petition, ordered minor maintained with the Js, and applied FR bypass, since parents failed to make reasonable efforts to treat the problems leading to removal of the siblings after termination of services and their parental rights. The court set a section 366.26 hearing for November 18, 2013, and suspended visits, due to concerns that minor was suffering from PTSD.

In August 2013, this court dismissed parents' writs relating to the July 2013 J/D judgment in case No. E059195.

In a CFS packet dated August 8, 2013, a social worker reported that minor was referred to therapeutic services (SART[2] services) because of her PTSD diagnosis.

Minor's sibling, E.A, was born August 2013. CFS initiated a dependency proceeding on E.A.'s behalf. Parents received services for E.A., and reunified with her at the section 366.26 hearing in March 2015.

---

[2] SART is an acronym for Screening, Assessment, Referral and Treatment. SART therapeutic services are available for children ages zero to five years of age.

5

C.       PARENTS' SECTION 388 PETITIONS SEEKING SERVICES

During October and November of 2013, parents filed section 388 petitions seeking FR services and visits with minor.  Parents attended substance abuse treatment and counseling with Licensed Marriage and Family Therapist (LMFT) James Powell.  Powell wrote in support of parents' petitions, arguing that it was unfair to suspend visits based on two cockroaches found in the family home, and that parents were just doing laundry that day, which explained the condition of the family home.

In response to the section 388 petitions, social worker Stephanie Nichols summarized the four dependences involving six of parents' children.  The cases were initiated because of parents' substance abuse problems, neglect, failure to provide basic needs, unsanitary/unsafe living conditions, incarcerations for child endangerment, and a lengthy child protective services history.  CFS recommended denial of the section 388 petitions.  The social worker reported that visits between mother and minor were detrimental to minor[3]  If visits were to be ordered, the social worker stated that minor's therapist and psychologist should be consulted.

The court vacated the November 18, 2013 section 366.26 hearing and set a section 388 and section 366.26 hearing for November 26, 2013.

D.       SECTION 366.26 REPORT AND CAREGIVER REPORT

The November 18, 2013, section 366.26 report recommended termination of mother's and father's parental rights as to minor.  When minor saw her parents in May

---

[3]  The social worker did not directly address visitation with father because his section 388 petition had not been filed at that time.

2013, she appeared visibly upset, cried, screamed and shook. Parents tried to take her into the playroom and minor repeatedly stated, "'I can't. I can't.'" The visit was terminated.

Minor's caregivers, the Js, adopted minor's four siblings and wanted to adopt minor. B.J. and S.J. were described as warm and friendly. Their parenting styles were described as consistent, patient, flexible and loving. The Js obviously loved and enjoyed minor, and incorporated her into their family. Minor appeared strongly bonded with the Js and exhibited a healthy attachment to them. Minor responded to S.J. as her parental figure.

According to the Js, minor was placed with the Js at just two days old, in October 2010, and remained there until November 6, 2011. At the time, minor slept peacefully, alone. Since returning to their care on May 29, 2013,[4] minor often woke up with night terrors, saying things such as "'I can't!'" and "'No! No! No!,'" loudly screaming, waking everyone in the home.

Minor would only sleep on B.J.'s chest, with her arms around his neck. If B.J. tried to put minor on a pillow, minor would clench his neck and scream. Lately, minor could sometimes sleep in her own bed, but she paced the floors at night. She asked when her daddy, B.J., was returning. If minor fell asleep without the Js, she woke up and found them. Minor did not exhibit this behavior when she was initially placed with the Js.

---

[4] The report misdated the year as 2010, before N.A. was born; 2013 is the correct year.

The Js described minor's fears of being taken away from her foster family. The Js also reported that minor would stare into space, drool, shake, and fall. She was referred to a neurologist, who diagnosed her with "absence seizures." Finally, the Js noted that minor had trouble being in a restrained seat—in a booster seat at the dinner table or in a car seat. Minor also had extreme tension and anxiety while riding in the car seat.

E.    CONTESTED SECTION 388/366.26 HEARING

On November 26 and December 4, 2013, the juvenile court held the sections 388 and 366.26 hearings. The court received reports into evidence and social worker Nichols testified.

Nichols testified that parents had not visited minor since June 7, 2013, because minor was diagnosed with PTSD. Minor was referred to SART, and received attachment-based therapy and group therapy. She was also diagnosed with fetal alcohol syndrome. Since starting therapy, minor's PTSD symptoms, such as night terrors and fear of sleeping alone, decreased. Attachment therapy was intended to help repair the bond between the child and care providers since minor moved from the Js to her parents, and then back to the Js.

After argument by counsel, the court granted parents' section 388 petitions, set a 12-month review hearing for June 4, 2014, and an appearance review for January 14, 2014, to address visits.

F.    REUNIFICATION SERVICES

1.    *INTERIM-REVIEW REPORTING AND HEARING*

On January 7, 2014, the Js filed a request to be declared minor's de facto parents. Minor had lived with them for 13 months (Oct. 2010—Nov. 2011), since she was two days old, then returned to their care in May 2013.

The January 14, 2014, CFS report stated that minor was diagnosed with Anxiety Disorder, evident by her nightly episodes of crying and screaming in her sleep, screaming during visits, clinging to the Js during social worker visits, statements by minor indicating that she does not want contact with parents, difficulty separating from the Js at preschool, and fears of being abandoned.  CFS recommended that parents participate in counseling and substance abuse treatment, and attend weekly visitation with minor in a therapeutic setting.

Minor's preschool teacher, Yvonne, wrote a letter to the court.  In the letter, the teacher stated that on December 4, 2013, a SELPA (Special Education Local Plan Area) counselor met minor, and minor instantly stated, "I want my mom to pick me up."  The teacher reassured minor, but minor repeated, "Ms. Yvonne, I don't want to go I want my mom to pick me up."  Minor was apparently referring to S.J. as her mom.  The teacher described minor's separation anxiety as occurring when minor was separated from the Js. The teacher stressed minor's need for consistency and routine.

LMFT Wendy Durkey diagnosed minor with anxiety disorder.  She opined that the relationship between parents and minor included "maladaptive interactive patterns [that] are rigidly entrenched."  Also, Intervention Specialist Gelcie Hitchman and LMFT Audra

9

Sengstock, noted that minor was difficult to engage, and anxious about being separated from the Js and her siblings. Minor had episodes of crying and clinging, and a fear of abandonment when the specialist visited minor. The Js reassured minor. Moreover, minor experienced emotional dysregulation with any change in routine. Hitchman recommended ongoing therapy for minor, a stable placement, structure, and caregivers attuned to minor's anxiety.

On January 22, 2014, at an appearance-review hearing, the court granted the Js' request for de facto parent status. The court also ordered parental visits to occur weekly for a minimum of one hour, supervised by CFS. The court authorized the social worker to terminate visits if minor had a "melt down."

2. *SECTION 366.21, SUBDIVISION (F), REPORTING AND HEARING*

The 12-month review hearing report filed June 4, 2014, recommended that FR services be continued. Mother progressed in her services but parents seemed complacent about reunifying with minor. Father minimally progressed in services, and blamed others for the removal of his children from parents' custody.

Moreover, there were issues with the visitations. On January 29, 2014, the social worker talked with minor about seeing her parents. N.A's facial expression changed and she became tense. When B.J. came out to the lobby, minor was holding his hand. Minor put her head down, grabbed the social worker's hand, sat on her lap, and hugged the social worker for five minutes while facing away from parents. Parents pulled out toys; eventually, minor played with the toys.

Prior to a February 12, 2014, visit, the social worker saw a "confrontation" between father and B.J. B.J. was holding minor; father "wanted" the child and B.J. would not give her to him. B.J. asked father to wait for the social worker to arrive. Father stated "'[t]he [motherfucking] visit starts now. It's my [motherfucking] daughter.'" As they were heading to the visit room, father told the social worker that minor "'needs to be moved from that [fucking] place.'"

During the visit, minor asked to go with her "daddy." When the social worker indicated that the visit would soon be over, minor again stated that she wanted to go with her daddy. When father stated that he was minor's daddy, she replied, "No."

Following the visit, the social worker met with parents. Father argued with the social worker in support of removing minor from the Js. The social worker advised that minor had nightmares, stress upon separation from the Js, crying spells, and tenseness. The social worker stated that minor suffered because of disruptions in her life and she benefitted from secure attachments. Father responded by requesting a new social worker. The social worker later noted that father lacked concern for minor, and opined that father failed to benefit from services and had anger management issues.

At another visit mother told minor to give food or drink to father, and minor said, "That's not my dad."

Therapist Hitchman noted that minor had more stress since visits with parents resumed. Minor looked to the Js for comfort. Minor also referred to father as "[t]he lady's brother," or "the boy," and told Hitchman, "I don't want to go there. I don't want to go see those people."

11

The Js reported that minor appeared withdrawn and tired after visits, had trouble sleeping, and a loss of appetite. Prior to visits, minor stated, "'I don't wanna go. I don't wanna go.'" Since visitation with parents resumed, minor clung to B.J. when she was dropped off at school.

In March 2014, the social worker spoke with minor about visits. Minor simply stated, "uh huh," and asked to play with her sisters and ran off. In April 2014, the social worker again spoke with minor about the visits. Minor appeared annoyed and stated that she did not want to visit; she felt sad, but happy when "I go home."

B.J. indicated that after a recent visit, minor reported, "'I want my daddy'" and "'I don't want to go to visit.'" Parents suggested the Js were coaching minor, but the Js denied any coaching. The social worker did not believe the Js were coaching minor.

Minor's anxiety hindered her performance at preschool. It also took about six weeks for minor to feel comfortable meeting with her therapist, Hitchman. Minor cried, became tense, and asked for the Js. Minor appeared bonded with the Js; she looked to them for comfort, she called them "'mommy'" and "'daddy.'" The Js reported that when minor was returned to them in May of 2013, she went right to them as though she remembered them.

At the 12-month review hearing on June 4, 2014, by agreement of the parties, the court ordered visits to occur in a therapeutic setting; mother may also attend supervised visits. The court continued FR services, and set the section 366.22 hearing for November 4, 2014.

12

3.    *INTERIM REVIEW AND SECTION 366.26 REPORTING;*

*FATHER'S SECTION 388 REQUESTING MORE VISITS*

A CFS packet dated July 18, 2014, summarized parents' progress in bonding therapy.  Parents and minor interacted appropriately together.  The therapist, Wanda Cooper, MFTI (Marriage and Family Therapist Intern), opined that minor's attachment and bonding were disrupted, evidenced by minor being uncertain who her parents were.

On September 11, 2014, father filed another section 388 petition requesting increased visitations with minor.  The social worker responded by asking the court to increase father's visits to twice weekly, and authorized unsupervised and overnight visits.  Father was making progress.

At the section 388 hearing on October 2, 2014, minor's counsel objected to increased visits.  A trial on the petition was set for October 23, 2014.

A CFS addendum filed October 20, 2014, stated that in an October visit, minor apparently enjoyed herself and called father, "daddy."  After a September visit, however, minor returned home and stated, "I don't want to go to the visit because of the boy.  The boy was there.  It wasn't good."  Minor referred to father as "the boy."

Moreover, therapist Hitchman's report dated September 6, 2014, indicated that minor attended therapy from May 2013 to September 2014 to address minor's anxiety.  Minor was anxious when separated from the Js and her siblings.  After visits, she became unfocused, had difficulties sleeping, and sought comfort from the Js.  Minor suffered emotional dysregulation following a change in routine.  She required consistent, calm,

13

and nurturing caregivers, and ongoing therapy to address her past trauma. The Js were attuned to minor's anxiety and were nurturing.

In a report dated October 20, 2014, MFTI Cooper reflected on therapeutic visits with minor and parents. Minor admitted that she had recorded her own song on her tablet, with lyrics that stated, "I don't want to go to therapy. I don't want to go to my visits." She believed that she would not see her siblings if she went to therapy. Cooper felt that parents were committed to enhancing their parenting skills. She indicated that the Js refused to speak with her, but the social worker investigated the issue and found that Cooper was rude to the Js and refused to hear their concerns.

At a hearing on October 3, 2014, the parties agreed that supervised visits would occur twice weekly, one and one-half to two hours outside of a therapeutic setting, and CFS may increase or liberalize visits through court packets.

Social worker John Callahan's section 366.26 report filed October 24, 2014, noted minor's concurrent plan was adoption by the Js. Parents tested negative for substances, and father demonstrated less anger. Parents, however, relied on father's disability funds as their primary income, and they remained on probation for willful cruelty to minor. Callahan recommended termination of services, and a finding that custody by parents remained detrimental to minor. Minor attended therapeutic visits with apparent ease, but she told the Js and, once, the social worker, that she did not want to visit with parents. Minor called parents "'that boy or that girl.'"

Moreover, minor's therapist reported that minor demonstrated anxiety and had "night terrors." She was only "slowly" adjusting to the visits. It was in minor's best interest to be provided with a permanent, safe, and stable home.

On November 4, 2014, at the section 366.26 hearing, minor's counsel referenced a recent letter from minor's preschool teacher, which stated as follows: "[Minor] has been experiencing some signs of separation anxiety this week. She has been getting upset when her dad drops her off at school. Today she was crying and said, 'I want my dad.' I had to call him to pick her up from school. I asked her if anything at school was making her sad and she said, 'Yes, my dad had to leave. I want to play with him.' When her dad arrived she had a smile on her face and was glad to see him."

The court attached the letter to the CFS report, and set a pretrial settlement conference and trial to address father's visits and section 366.22 issues.

On November 25, 2014, at the pretrial settlement conference, counsel for CFS stated that minor went to the doctor the day prior and was diagnosed with PTSD. Minor had anxiety and abdominal pain, associated with the visits. A related report signed by Nurse Practitioner (NP) Yolanda Battle stated: "Child stated to me 'I'm never going to see them. I don't want them kissing me, they're not my parents.' Child very reluctant to go for visitation. Brings on severe anxiety attacks."

4.    *CONTESTED VISITATION/SECTION 366.22 HEARING*

The section 366.22 visitation trial took place on several dates from December 2014 to late February 2015. The court admitted several reports into evidence, which included a letter from NP Battle indicating minor's diagnosis of anxiety and PTSD on

15

November 24, 2014, stemming from "bio-parent visitations." The court also received testimony from several witnesses.

### a) Foster Father's Testimony

B.J. testified that minor was placed in their home at two days old. When minor was returned in late May 2013, she would only sleep on his chest, and often woke up screaming. Minor also talked in her sleep. She had night terrors where she would sit on the floor screaming. In the last six months, minor had about four night terrors. Minor experienced anxiety before visits and severe outbursts that the Js had not before experienced with her.

Visits resumed about eight months after minor was placed with the Js. Minor experienced stress and expressed she did not want to visit. Father argued with B.J. after minor said she did not want to go to the visits. Father approached B.J.; B.J. stated that they needed to wait for the social worker. Father then said, "'This is my motherfucking daughter,'" which upset minor. When B.J. stood up, minor hid behind his thigh.

B.J. encouraged minor to visit. She went to visits reluctantly. Since May of 2013, minor had perhaps six or seven seizures. Minor had separation issues at preschool; she cried uncontrollably and held onto B.J.'s leg. Minor's therapist, Hitchman, went to minor's school to provide therapy; however, because minor had a meltdown during therapy at school, Hitchman went to the Js' home to provide therapy.

B.J. testified as to the physical manifestations of minor's anxiety, including that after parental visits, minor pulled the car seat belt forcefully against her vagina and she would wake up screaming. Minor stated she did not want to attend either the parental

16

visits or the therapeutic visits; the statements were spontaneous. She made up songs and role played about her reluctance to attend visits. She often named her siblings and said, "'This is our house,'" and she wanted to be with them. Minor and her four siblings were definitely bonded. When B.J. was asked what he did to alleviate minor's stress and anxiety, he testified that he gave her a loving home, took her to therapy, and encouraged minor to use her words to express her feelings.

b)      Minor's Testimony

Minor testified that she did not have more than one mommy or daddy. Parents were people she visited. When asked if she liked to play with parents, and to live with them, she said yes, to both questions. Parents were nice at visits; she was not afraid of them and wanted to stay at their house. Minor named the Js and her siblings, and said they live with her at her house, in a blue house.

Many of minor's responses were "yes" or "no," but when she was asked, first, if she liked visiting father; and second, if she wanted to see him more often, she said "'uh-huh'" on both accounts. However, when minor was asked if she wanted to see B.J. more, she said "Yes."

Minor admitted she made up songs about visits, but could not remember her songs. When asked if she liked living in the blue house, she said "'Yes,'" and confirmed that she wanted to stay at her house, the blue house.

c)      Foster Mother's Testimony

S.J. testified that minor was fine when she was not visiting her parents. Before the first visit, minor asked why she had to attend. After minor visited parents in May 2013

17

she was distraught, upset, crying, and anxious. She kept saying, "'I can't. I can't. I can't.'" S.J. took minor to a doctor because she got diarrhea. The examiner asked minor how she was feeling, and minor told the examiner that she did not want to go to visits. Minor had diarrhea and uncontrollable crying and shaking at the medical office, and was diagnosed with PTSD. She did not demonstrate such conduct when not visiting parents.

From day one of her placement, minor called S.J. "mom," nothing else. It was a task to encourage minor to go to therapy. Minor would ask, "'Are you coming back? Are you going to be there?'" S.J. reassured minor. In November 2014 minor refused to visit her parents. She sat "Indian style" on the floor, crying. In December, S.J. was called to pick minor up from a visit early. Minor told her sibling, "I want to stay with you." Minor got anxious when B.J. left the house. Her siblings calmed her down by playing with her, hugging and kissing her.

In August/September 2013 minor had difficulties being left at preschool. She wanted the Js to stay with her and would cry. Minor sporadically had issues with being dropped off at school.

Minor had a new SELPA therapist. She clung to the Js every session and if they left the room, she came out of the room with the therapist to check on the Js.

### d) Social Worker Callahan's Testimony

Social worker Callahan testified that near the inception of the case, visits were suspended roughly for seven months. During a visit in August 2014, he observed that minor seemed to enjoy herself, but she reportedly had anxiety after visits. Visits were not increased, because of minor's night terrors.

18

Minor called parents "'mommy'" and "'daddy,'" but when visits ended, minor ran down the hall and wanted B.J., or whoever was picking her up. Visits in January and February 2015 seemed to be going fine. When the visits ended, mother typically asked for a hug. Minor hugged parents but it was not her first choice. One day, she gave the parents a "high five" instead. She was out of the door as fast as possible, waiting for B.J. Minor was ready to leave visits; she neither cried nor said she missed parents.

Callahan estimated it would take a year for minor to be comfortable enough to spend the night with parents. Minor saw the Js as her parents. Callahan and his supervisor agreed that visits should progress naturally, based upon the child's reactions. When the final review hearing approached, "we were a long ways away from unsupervised visits."

Minor's behavior with visits reflected her anxiety. She did not do well with quick changes. If minor were to be placed with parents, "she would be crying and screaming for her foster parents and siblings."

The Js shared that minor had night terrors after visits with parents. In November 2014 some visits ended early because minor wanted to leave. Minor told Callahan that she did not want to visit; at other times, she said she did want to visit.

Minor's main therapist, Hitchman, recommended suspending visits due to minor's stress and anxiety; CFS continued visits. Callahan stated that emotional detriment to minor was the issue. She saw the Js as her family. Callahan advised against placing minor with parents since visits alone caused her anxiety and stress.

Minor was very bonded with her siblings that lived with the Js, and was attached to the Js. She called them mommy and daddy, and ran up to them after visits. The siblings all "get along." Callahan recommended a reduction in visits, to once monthly, which appeared to be in minor's best interest.

e) <u>Social Worker Evanow's Testimony</u>

Social Worker Margaret Evanow testified that she was employed by the Children's Advocacy Group and had been a social worker for about 13 years. She was a licensed professional clinical counselor, with a master's degree in educational psychology and two years of doctorate work in psychology.

Evanow observed a total of three visits, in October, November and December 2014. In October, minor said hello to parents but had no physical contact with them. When the visit ended, mother went to pick minor up, and minor arched her back and said, "'No, I don't want a kiss or a hug.'" Mother gave her a "side hug." Minor took B.J.'s hand and walked out. Minor lacked a strong bond or attachment with mother.

At the November visit, parents and minor played with bubbles, which got into minor's hair. Mother tried to fix minor's hair, and she said, "No"; she wanted her foster mom to do it. When the visitation monitor asked minor why, she responded, "'because she is fun to play with.'" Mother asked minor if she liked playing with parents. Minor replied, "Yeah, I do." Minor said she wanted her foster mom. Mother looked hurt, which seemed to make minor anxious. Parents played ball with minor. When mother warned minor to come away from the street, minor refused. She then repeatedly stated that she wanted her foster mom. When the monitor asked if she wanted to go home,

20

minor replied "Yes," and shook her head vigorously while making eye contact with parents. Minor again stated that she wanted to go home to her foster mom. When father asked what made minor say that, she responded, "Me." Evanow believed minor said goodbye, but gave no hugs.

At the December visit, minor played comfortably with parents. Near the end of the visit, she kept peeking down the hallway. After the visit concluded, minor simply retrieved her belongings and left, with no apparent problem.

On November 29, Evanow visited minor's foster home. Minor showed off her bed, her bedspread, and toys. Evanow noted that minor "is extremely close to her siblings. They play very well together. She loves her sister." When asked about visits, minor said she enjoyed them; there were fun toys there. Evanow inquired where minor wanted to live. Minor replied with her "brothers and sisters" and "pop-pop and . . . grandma," referring to the Js extended family.

Regarding bonding and attachment with the foster and biological parents, Evanow stated: "[Minor's] behavior speaks very clearly about an attachment with her foster parents. There's no distress when she leaves these visits. Whether she says bye or not, she is already walking out the door. Her play session has ended and she's leaving and she is very comfortable in leaving." To minor, the visits with parents appeared to be "playdates."

Finally, Evanow reviewed taped vignettes of therapeutic visits with Cooper. Evanow opined that Cooper asked leading questions of minor, putting words in the child's mouth.

### f) Therapist Cooper's Testimony

Therapist Cooper completed her doctorate study in clinical psychology, but did not have a doctorate degree. She was an MFTI, supervised by a LMFT who did not sign off on Cooper's letters filed in the court.

Cooper assessed bonding between minor and parents. Cooper noted that at times, parents hugged minor and she reciprocated. She called them "'daddy'" and "'mom.'" There were smiles and harmony in sessions. Parents and minor were bonded. A child can be bonded with her biological and foster parents, and have conflicted loyalty. In 10 to 12 sessions, Cooper did not see evidence that minor would suffer harm if returned to parents. Cooper, however, admitted that she did not know whether minor would suffer emotional detriment with even unsupervised visits.

Cooper testified that minor not residing with parents in the crucial first year of life would cause bond and attachment disruption, resulting in a bond with the primary caregivers. This was the time when a child learned and developed secure attachments, and things such as trust and love.

Minor was bonded with her siblings; she talked about them. Cooper did not know the degree of bonding between minor and the Js. Minor recorded a song saying she did not want to go to therapy and visits. Minor teared up and said she sang it thinking she would not see her siblings again.

Cooper noted that father's confrontation with B.J. on February 12, exhibiting disruptive behavior and witnessed by minor, could adversely impact a child.

## g) Preschool Teacher Yvonne's Testimony

Minor's preschool teacher, Yvonne, testified that minor took longer than the rest of the class to get comfortable with adults. Minor would hold onto the Js' legs and beg them to stay with her and not leave. Minor would also cry. Initially, this occurred two or three times per week. Then, from October to December 2013, it occurred about once a week. By January 2014, it occurred about once or twice a month. Minor missed school the day after visits. Minor had a hard time and clung to the Js.

Once the Js had a friend of theirs pick minor up from school; minor cried. Minor insisted that only the Js pick her up. If not, she cried. In the 2014 to 2015 school year, minor's counselor arrived at the school to work with minor. Minor cried and said, "I don't want to go with him."

## h) Trial Court's Findings and Orders

On February 25, 2015, the hearing concluded. After argument, the court stated "we are looking at emotional detriment" of returning minor to parental custody. Minor resided in a "horrendous environment" when CFS intervened. She suffered from stress and anxiety, and "issues as a result, quite frankly, of the actions of her parents." Minor was uncomfortable with parents. She was bonded and exuberant when playing with her siblings. Cooper noted that minor was attached to her caregivers and biological parents. However, minor told the Js she did not want to visit. She had anxiety stemming from the change, and was clearly conflicted.

The court noted that the visits had gone at minor's pace, and returning minor to parents would create a substantial risk of detriment to minor's safety, protection, or

23

psychological/emotional well-being. Although the court found detriment with return, the court ordered unsupervised day visits to occur at least one or two hours, twice weekly, at a neutral location. The court set a hearing for March 5, 2015, to receive an update from CFS on visits. The court also set a section 366.26 hearing for June 25, 2015.

### 5. *WRIT PROCEEDINGS (CASE NO. E062965)*

In a writ proceeding, parents challenged the sufficiency of the evidence supporting the finding of detriment with return of minor to parents. We determined that the juvenile court properly found detriment and denied the petitions. Minor reacted negatively to "mere *visits*" with parents. Thus, "it was reasonable for the court to conclude that returning the child to their *custody* would be detrimental to her emotional well-being." (Opn., case No. E062965, pp. 16, 18.)

### 6. *APPEARANCE REVIEW AND SPECIAL SETTING ADDRESSING VISITS*

The court held two hearings to address visits, first on March 5, and then on May 19, 2015.

#### a) Appearance Review

Social worker Callahan's report for the March 5 hearing stated that he went to transport minor to a visit; she began to cry and yell, and stated that she did not want to visit. Callahan told minor that she was going to visit parents at Carl's Jr., so she could play in the play area. Minor refused. Due to her anxiety and stress, Callahan did not force minor to go to the visit. The next day, March 3, 2015, he went again to take minor; she refused to leave and yelled "no." Minor was extremely clingy with S.J., who

24

encouraged minor to visit. Thereafter, minor did not want to be alone at school. S.J. had to keep her home. Minor was overly anxious when S.J. was not in her view.

On March 5, 2015, the court held the appearance review for minor, and a section 366.26 hearing for her sibling, E.A. CFS recommended the return of E.A. to parents. The court placed E.A. with parents and ordered family maintenance services. As for minor, the court acknowledged her distress even with the thought of visiting parents. The court noted that minor was "backsliding," and theorized that reverting to supervised visits may allow the child to attend visits. The court ordered supervised visits and set a weekly visitation schedule. The court gave CFS the authority to liberalize visits, and CFS could allow unsupervised visits if minor chose to participate.

b)      Special Setting

Parents did not appeal the court's March 5, 2015, visitation order. Instead, father's counsel filed a motion contending that the visitation order was not being followed.

Social worker Callahan confirmed that no visits occurred since March 5, 2015. Each week, minor was asked if she wanted visits, and she stated, "'No.'" Callahan inquired himself, and minor stated "'No.'" When asked why, she stated, "'I don't want to.'" Minor responded the same way every week, and would get angry, cry, throw temper tantrums, and refuse to get in the car. CFS management opined that minor should not be forced to attend visits. Minor's behavior and attitude improved since minor had not visited with parents; her nightmares diminished and she was less clingy. Minor's therapist, Marquette Brown, stated that he could not even mention parents in his sessions.

25

If he did, minor shut down. Callahan vowed to work with minor and Brown on visits, and reported that parents were only concerned about their needs, not the child's.

An April 2015 report by therapist Brown indicated that minor began therapy in September 2013. Minor often shut down in the weeks that she visited with parents. Minor required comfort from the Js to engage in therapy. Recently, minor began using her voice to empower herself when anxious. Minor had several symptoms consistent with anxiety and/or previous trauma, and required ongoing therapy. It was important for minor to continue attending school on a regular basis; it was an opportunity to experience structure and routine, and learn social skills.

On May 19, 2015, the court held a hearing addressing visits. All counsel and the court grappled with how to resolve minor's refusal to visit with parents. They thought visits between E.A. and minor would be helpful. The court asked Callahan to initiate sibling visits, and file an information packet advising the court when the visits were established. Minor, however, refused to attend the visits with E.A.

### 7. *SECTION 366.26*

Social worker Victoria Hill submitted a section 366.26 report filed June 23, 2015. Hill reported that minor resided with her four siblings who were adopted by the Js two years prior. Minor refused to visit parents and refused to go to the CFS office for visits. She stated that CFS would continue to encourage minor to visit with E.A.

Minor felt comfortable, safe and secure with the Js. S.J. was a stay-at-home mother, and B.J. worked and supported the family. The Js were very consistent, patient, flexible, and loving parents. Minor appeared happy and was thriving in the home. The Js

26

appeared to be stable, strong, nurturing, honest and dependable.  They incorporated minor into their family unit.  They stated that minor was as dear to them as any biological child they could imagine having, and obviously loved and enjoyed her.  Hill opined that it was in minor's best interest to be adopted by the Js.  Hill noted that minor exhibited a healthy attachment to the Js, who were minor's parental figures.  The Js were eager to adopt minor.

Parents objected to the termination of their rights.  The court set a section 366.26 hearing for July 23, 2015.

At the trial, the court considered the section 366.26 report, the reports addressing visits, and a letter by mother submitted in lieu of testimony.  In the letter, mother indicated that she and father made unintentional poor choices.  They, however, loved their children.  She and father changed; they completed services, were free of substances, and had not missed visits with minor.  The letter also provided that they accepted responsibility for the removal of their children, but the "system" failed them.  Mother felt the court's visitation order was ignored, and also stated her belief minor wanted to visit them, and that reports to the contrary came from the Js.

Counsel for each parent objected to the termination of parental rights, but did not argue that the visitation orders were unlawful.  Minor's counsel noted that she clearly wished to be adopted, and did not want to visit parents.

The court recognized that parents tried to visit, but minor exhibited distress and refused to attend the visits.  Minor's therapist indicated that minor shut down and would not engage in sessions; parents could not even be mentioned during therapy.  Minor's

27

behavior and attitude improved since she had not seen her parents. The court found that there was no evidence that parents' relationship with minor promoted the well-being of minor to such a degree as to outweigh the well-being minor would gain in a permanent home with the Js. The court also considered minor's wishes, consistent with her age. The court then found minor adoptable, and no exception to adoption existed, before terminating parental rights. Parents appeal.

## DISCUSSION

### A. THERE WAS NO VIOLATION OF PARENTS' DUE PROCESS RIGHTS

Father argues that the juvenile court violated his due process rights by failing to ensure that court-ordered visitation occurred between parents and minor.[5]

### 1. LEGAL BACKGROUND

The court has broad discretion in fashioning visitation orders and the court's determination will not be disturbed on review absent a clear abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) When making these orders, the court must always consider the best interest of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 973-974.)

Under section 362.1, subdivision (a)(1)(A), parent-child visitation shall occur unless the juvenile court finds visitation to be detrimental to the child. Visits must be consistent with the well-being of the child, and no visitation order shall jeopardize the child's safety. (§ 362.1, subd. (a)(1)(A) & (B).) Moreover, when FR bypass is applied,

_____

[5] Mother and father have joined in each other's arguments under California Rules of Court, rules 8.200(a)(5), 8.204(a).

28

the court "may" continue to permit the parent to visit the child, unless it finds that visitation would be detrimental to the child. (§ 361.5, subd. (f); *In re J.N.* (2006) 138 Cal.App.4th 450, 457.) Thus, the court has no discretion to allow visits in an FR bypass case where visitation is detrimental to the child. (*J.N.*, at p. 457.)

The court may suspend visits with a parent upon a finding that the visits are detrimental to the child. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138; *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357.) Detriment includes harm to the child's emotional well-being. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.) "If that were not the case, a court would be required to sit idly by while a child suffered extreme emotional damage caused by ongoing visits." (*Brittany C.*, at p. 1357.)

Once reunification services are terminated, the focus shifts to the needs of the child, not the parents. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) A section 366.26 hearing is designed to protect the child's compelling rights to have a placement that is stable and permanent, and allows the caretaker to make a full emotional commitment to the child. (*Marilyn H.*, at p. 306.) If the child is likely to be adopted, the court must terminate parental rights and order adoption, "unless one of the specified circumstances [in section 366.26, subdivision (c)(1)] provides a compelling reason for finding that termination of parental rights would be detrimental to the child." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

### 2. *THERE WAS NO DUE PROCESS VIOLATION*

Father argues that his due process rights to visitation were violated because the court "'suspended' father's visitation rights *for over seven months* at the commencement

of the dependency case without making a statutorily required finding that visits were detrimental to the child. This suspension of visitation interrupted critical bonding time and severed the parent-child bond." Moreover, both mother and father argue that the court violated their due process rights because the court failed to ensure that court-ordered visitations occurred by delegating its duties to authorize visitation to minor.

### a) The Visits Were Detrimental to Minor

First, we address father's contention, joined by mother, that "the court completely violated parents' rights to visitation by 'signing a packet' (after father had only one, single visit) suspending visits without a specific finding that visits with the father were detrimental to [minor]."

In a prior writ proceeding, parents argued that the juvenile court erred at the section 366.22 hearing by finding it detrimental to return minor to parental custody. The underlying hearing addressed two issues—father's request for more visitation, and section 366.22 issues. Visitation was a key issue addressed at the hearing.

In our writ opinion, we concluded that minor reacted negatively to "mere *visits*" with parents, so "it was reasonable for the court to conclude that returning the child to their *custody* would be detrimental to her emotional well-being." (Opn., case No. E062965, at pp. 16, 18.) Detriment during visits was a key component of our assessment of the sufficiency of evidence indicating harm to minor upon return to parents. (*Id.* at pp. 14-18.)

For example, we wrote: "Here, the evidence clearly demonstrated that returning the child to the parents' custody would be detrimental to her. It showed that even

supervised visits with the parents caused the child anxiety and stress. . . . At the outset of the dependency, the child had a visit with the parents at the CFS office, and she cried, screamed, and shook when she saw them. When they attempted to take her into the playroom, she repeated said, 'I can't. I can't.' The visit was ended because of the child's reluctance and unwillingness to interact with the parents. After that visit, the child was diagnosed by a nurse practitioner with PTSD and anxiety, 'brought on by her [b]iological dysfunctional family unit.' The nurse practitioner recommended that here be no visitation between the parents and the child. *Thus, the court ordered visitation between the parents and the child to be suspended due to it being detrimental to the child at that time.*" (Opn., case No. E062965, at p. 14, italics added.)

Therefore, under the doctrine of law of the case, the finding of detriment as to the visitation at the commencement of the case is binding. (Cal. Rules of Court, rule 8.1115(b); *Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893.)

In her reply brief, mother argues that the threshold requirement to apply collateral estoppel was not met in this case "because the issues in the writ petition were not identical to the issues in the parent[s'] challenge to the terminal of parental rights. Although there was a visitation related issue in the writ proceedings regarding whether [minor] could be returned to her parent[s'] custody, the subsequent juvenile court hearings involved multiple different court orders for visitation and ultimately resulted in the issue of non-visitation which was not 'identical' to the issue in the writ proceedings."

We agree with mother that parents are not barred by collateral estoppel by challenging the issue of detriment for orders that were not addressed in the writ petition.

31

The doctrine of law of the case, however, is only being applied to address father's argument that the court erred in suspending visits at the commencement of the dependency case—an argument that was clearly addressed in our writ opinion.

b)      There Was No Delegation of Power

Next, we address parents' argument that the juvenile court gave minor complete discretion to veto visitation, which violated their due process rights.

In *In re Danielle W.* (1989) 207 Cal.App.3d 1227 (*Danielle W.*), the mother in a juvenile dependency case appealed from the visitation portion of the disposition order. The mother argued that the order delegated all control over visitation to the social worker and the two children and therefore was an abuse of discretion, a denial of due process, an unauthorized delegation of judicial power, and an extra jurisdictional act. (*Id.* at pp. 1230-1239.)  The appellate court noted, "appellant mischaracterizes the juvenile court's visitation order:  the juvenile court did not delegate all control over visitation.  The juvenile court, rather than ordering no visitation at all (despite evidence to support a finding that visitation by appellant would be detrimental to and not in the best interests of the children), ordered visitation under specific conditions." (*Id.* at p. 1233.)  The appellate court then affirmed the juvenile court order, holding that the juvenile court did not improperly delegate judicial power to the children or the department.  The children were only authorized to express their desires regarding visitation and the department was authorized to determine the specifics of how visitation would take place.  (*Id.* at p. 1237.)

In concluding the visitation order in *Danielle W.* was not an improper delegation of control over visitation, the court stated:  "[T]he visitation order does not represent an

32

improper delegation of judicial power. First, there is no delegation of judicial power to the children even though the order states in part that visitation is at the discretion of the minors. In the context of this case, this means the children should not be forced to visit with their mother against their will and in no way suggests that the minors are authorized to do more than express their desires in this regard. Second, the order simply authorizes the Department to administer the details of visitation, as specified by the court. Although the order grants the Department some discretion to determine whether a specific proposed visit would be in the best interests of the child, the dominant factor in the exercise of that discretion is the desire of the child to visit the mother. [¶] . . . [¶] We point out, however, that a visitation order granting the Department *complete* and *total discretion* to determine whether or not visitation occurs would be invalid. . . . The juvenile court must first determine whether or not visitation should occur, as was done here, and then provide the Department with guidelines as to the prerequisites of visitation or any limitations or required circumstances." (*Danielle W.*, *supra*, 207 Cal.App.3d at p. 1237.)

Here, the court did not improperly delegate to minor complete and total discretion to determine whether or not visitation occurred. On March 5, 2015, after the court acknowledged minor's anxiety and stress, the court ordered visits as follows:

"Court is going to order that the visits are supervised again for [minor] and the mother and the father. That visits shall be one time a week for two hours at a minimum supervised by Children & Family Services, visitation centers, or a delegate. That the mother and father shall not be under the influence of and are to refrain from using controlled substances during all visits. [¶] Children & Family Services has the authority

33

to liberalize visits as to frequency and duration, and I will include unsupervised day visits if [minor] chooses to do so and participate. I will also grant that authority."**6**

In *Danielle W.*, the appellate court stated, "In considering the best interests of the child, while still recognizing parental visitation rights, the juvenile court did in fact order visitation, under the one circumstance that would offer the best possibility that such visitation would be beneficial—when the child desired such contact." (*Danielle W., supra,* 207 Cal.App.3d at pp. 1238-1239.) The *Danielle W.* court noted that the order provided protection of the minor's psychological well-being. (*Id.* at p. 1239.) Likewise, here, the court allowed unsupervised visitation if minor agreed to it, but did not authorize forced visitation of any kind. As in *Danielle W.*, the juvenile court in the instant case did not improperly delegate its visitation authority to minor. The court merely directed CFS not to force minor to have unsupervised visits with parents.

The facts in this case are also similar to *In re Brittany C.*, *supra*, 191 Cal.App.4th 1343. In that case, the children suffered distress with parental visits. (*Id.* at pp. 1356-1358.) The juvenile court ordered that the children should not be "forced" to visit the parents. The children often refused to visit. (*Id*. at p. 1358.) In an appeal by the parents arguing erroneous deprivation of their visits, the appellate court confirmed the orders, and stated: "One need not be an expert to see that this family is damaged, perhaps beyond repair. There was nothing improper in the court taking a step back to consider the

---

**6** This order was later revised to "two times a week for one hour or one time a week for two hours."

34

recommendations of a therapist and the desires of the children before attempting to fashion a visitation plan that has a hope of success." (*Ibid.*)

Parents contend that the Js coached minor to avoid the visits. However, there was evidence to the contrary. Minor's therapists, Hitchman and Brown, and social worker Callahan, all personally witnessed minor's emotional meltdowns. Additionally, minor was diagnosed with an anxiety disorder and PTSD; she suffered great distress with parental visits consistent with her diagnoses. Notwithstanding this contrary evidence, father attempts to reargue the facts by pointing out the "obvious bias of the foster parents and their obvious efforts to thwart visitation in its entirety post-reunification." On appeal, "'"[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) We conclude that there was no violation of parents' due process rights.

## DISPOSITION

The judgment terminating mother and father's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.

35